NEWTON and another, Respondents, vs. THERESA VILLAGE MUTUAL FIRE INSURANCE COMPANY, Appellant.

SAME, Respondents, vs. WATERLOO MUTUAL FIRE INSURANCE COMPANY, Appellant.

SAME, Respondents, vs. DE FOREST MUTUAL FIRE INSURANCE COMPANY, Appellant.

*May 3—June 23, 1905.*

*Fire insurance: Fraud and false swearing avoiding policy: Evidence: Weight: Appeal: Findings: Annual inventories: "Three-quarters clause:" Statutes.*

1. In an action to recover for loss under a fire insurance policy where liability is denied upon the ground that the insured have been guilty of fraud and false swearing in making proofs of

loss, it is incumbent upon the defendant to prove wilful fraud and false swearing by clear and satisfactory evidence.

2. In such a situation, while the evidence, stated in the opinion, tended to show such wilful conduct, it is *held* not sufficient to call for a conclusion in opposition to the findings of the trial court acquitting plaintiffs thereof.

3. Under policies of insurance requiring inventories to be taken once a year, it is an unreasonable construction that, on pain of forfeiture, each inventory must be taken exactly twelve months after the preceding one.

4. In such case an interval of sixteen months between the last inventory and the fire is *held* not to have breached the policy.

5. A policy of fire insurance had attached to it a rider: "Permission is hereby granted for other insurance to an amount including this policy aggregating not to exceed seventy-five per cent. of the actual cash value of the property; provided, however, that if at the time of the fire the total insurance on the property shall exceed said seventy-five per cent., this policy shall hereby become void in proportion of such excess to such total insurance." *Held*, that such "three-quarters clause" was of no effect under the provisions of sec. 1943*a*, Stats. 1898 (declaring that no fire insurance company doing business in this state shall issue any policy containing any provision limiting the amount to be paid in case of loss below the actual cash value of the property, if within the amount of the insurance for which premium is paid).

6. The words "cash value of the property" in sec. 1943*a*, Stats. 1898, refer to the property destroyed, not the property insured.

Appeals from judgments of the circuit court for Dodge county: James J. Dick, Circuit Judge. *Affirmed.*

This is a consolidated action to recover upon three standard fire insurance policies issued by the defendant companies, respectively, on a stock of groceries which was owned by the plaintiffs in the city of Beaver Dam, and destroyed by fire a little after midnight on the morning of June 21, 1903. The defenses relied upon were (1) that the plaintiffs were guilty of fraud and false swearing, after the loss, in including in their statement of property destroyed goods that had never been received and were not in fact in the store at the time of the fire; (2) that the plaintiffs failed to take an annual inventory, as they had agreed to do in their applications and as

specifically required by the terms of the *De Forest* policy; (3) that, as to the *De Forest Insurance Company,* they failed to keep their inventory book in the safe, as required by the policy.   The case was tried by the court without jury.   The court found against the contentions of the defendants on all points; also that the total value of the property destroyed was $5,469.22, which was covered by insurance, amounting to $5,700, to wit, $1,200 in the *Theresa Company,* $1,500 in the *De Forest Company,* $1,500 in the *Waterloo Company,* and $1,500 in the Mayville Mutual Insurance Company. Judgment was rendered against the *Theresa Company* for twelve fifty-sevenths of the amount of the loss, and against each of the other two companies for fifteen fifty-sevenths of the loss, and the defendants each appeal.

For the several appellants there were briefs by *Richmond, Lamb & Jackman,* attorneys, and *C. F. Lamb,* of counsel, and oral argument by *Mr. Lamb.*

*M. E. Burke,* for the respondents.

WINSLOW, J.   The defense chiefly relied on was that the plaintiffs were guilty of fraud and false swearing in making their proofs of loss.   It is admitted that, in stating the amount of the loss in their proofs, merchandise to the amount of $128.51 was included in the gross amount of property claimed to have been destroyed which had been ordered before the fire but had not been received at the time of the fire; and it is also admitted that upon their examination in Milwaukee, after the making of the proofs, they testified that these goods had actually been received before the fire except as to three invoices from Walsh, Boyle & Co., of Chicago, amounting to $39.61, which they finally admitted had not been received.   They claimed that these false statements were made through innocent mistake, while the defendants claimed that they were wilfully made, and this was the issue to be decided.   Upon this issue it was incumbent upon the defend-

ants to prove the alleged wilful fraud by clear and satisfactory evidence. The trial court having found that it was not so proven, it becomes necessary to examine the evidence to ascertain whether it can be said that this finding is against the clear preponderance of the evidence.

The invoices in question were six in number, as follows: Swift & Co., Chicago, $14.75 and $9.70; Durand & Kaspar Co., Chicago, $64.45; and Walsh, Boyle & Co., Chicago, $12.21, $24.95, and $2.45. The bill of the Durand & Kaspar goods was dated June 20, 1903 (being the day preceding the fire), and was received by the plaintiffs on the same day. The bills of the Walsh, Boyle & Co. goods were dated June 22, 1903, and the dates of the Swift & Co. bills do not appear, but all of the goods represented in these invoices arrived at the railway station in Beaver Dam after the fire (although ordered before), and were receipted for by the plaintiff *Riss-man* on June 25th. Adjusting officers representing the various insurance companies arrived on the ground on June 22d and came again June 29th, but at neither date had the salvage been ascertained or the undamaged goods separated from the damaged goods, so that nothing was done. They finally returned to adjust the loss on July 13th, and at this time went over the entire situation with the plaintiffs. At this meeting the plaintiffs produced their books and the last inventory taken by them, dated February 10, 1902, as well as all invoices of goods purchased since the inventory, including the invoices in question. Upon the bills payable account in the ledger the six invoices in question were entered and all dated June 20, 1903. The insurance adjusters made up a statement of the loss in substantially the following manner: They started with the amount of the inventory of stock of February 10, 1902, being the sum of $6,524.55, and deducted therefrom twenty per cent. for depreciation, added outstanding accounts and cash on hand, making a balance of $5,661.06. They then took the amount of credit purchases.

and cash purchases since the inventory, less rebates, goods returned, bills for advertising, and "bills entered after the fire, $39.61," making $17,347.40. In this sum the amount of credit purchases was $15,780.12, and was obtained from the bills payable book and invoices, and included the six invoices in question. The item of "bills entered after the fire" referred to the Walsh, Boyle & Co. invoices, which the insurance adjusters testify were then admitted by the plaintiffs not to have been received. This amount of $17,347.40 was then added to the previous amount of $5,661.06, making a total on one side of the account of $23,008.46. On the other side, they took the total cash and credit sales since February 10, 1902, less twenty-five per cent. profit, and added thereto the personal accounts of both *Newton* and *Rissman* and cash on hand, making a total of $18,534.79. Deducting this from $23,008.46 they obtained a balance of $4,473.67, from which a further deduction of $384.56 salvage was made, leaving a net loss of $4,089.11.

During the negotiations the insurance adjusters became suspicious of the six invoices in question, and it appears that one of them took them from the file of invoices, without mentioning the fact to the plaintiffs, and went to the railway station, and there ascertained that the goods were receipted for by the defendant *Rissman* on the 25th of June. The adjuster retained possession of the invoices for further investigation, and they were not seen again by the plaintiffs until they were produced by the defendants upon the trial, with the exception of the Swift bills, which do not seem to have been accounted for. No agreement was reached at this meeting, but a copy of the statement made by the adjusters was left with the plaintiffs. The plaintiffs prepared formal proofs of the loss, and served the same August 2d. The proofs were prepared for them by an expert, Mr. Brennan of Milwaukee, after an interview with the plaintiffs at Beaver Dam, from papers and books then furnished him by the plaintiffs, includ-

·ing the adjusters' statement before referred to. The state-
ment of loss attached to the proofs placed the net value
of goods destroyed at $7,197.49, in place of $4,089.11, as
figured by the adjusters. The credit purchases are figured at
$15,780.12, thus including the six invoices in question, but
the item of deduction for "bills entered after the fire, $39.61,"
does not appear. No deduction for depreciation from the in-
ventory of February 10, 1902, was made, and the profits
were figured at thirty-three and one third per cent. instead of
twenty per cent., and the difference in these two items ac-
counts for the principal part of the discrepancy between the
adjusters' balance and the balance as appearing by the proofs.
After the service of the proofs, and on September 2, 1903,
the plaintiffs were examined on oath at Milwaukee, and *Mr.
Newton* testified that no merchandise received after the fire
was included in the proofs of loss, and *Mr. Rissman* testi-
fied directly that the Durand & Kaspar goods were received
before the fire and burned, but admitted that the Walsh,
Boyle & Co. goods were not received till after the fire. This
action was commenced December 9, 1903, and in the com-
plaint it was alleged that goods to the amount of $7,197.40
were destroyed by the fire. Upon substantially these facts
the defendants claim that wilful fraud was clearly proven.

Upon the other side, the plaintiffs testify directly that the
inclusion of the six invoices in the proofs and statement was
entirely an innocent mistake. They point to the fact that
they freely laid all the invoices before the adjusters, although
some of them bore date after June 20th, and hence would on
their face show that the goods could not have been received,
that these invoices were taken away by the adjusters on
July 13th, and that they did not see them again till the time
of the trial; also that they did not personally draw the proofs,
but gave to their expert who drew the proofs all the papers,
including the adjusters' statement, in which the credit pur-

chases appeared at $15,780.12, and the deduction of the Walsh, Boyle & Co. bills also appeared.

*Mr. Rissman* explains his receipt for the goods on June 25th by stating that he went to the depot with his teamster to get some goods of whose arrival he had been notified; that there were other teams waiting for goods, and that he went in the station and signed receipts on several freight bills, the top one of which contained the initials of Walsh, Boyle & Co., and he supposed they were all Walsh, Boyle & Co. goods; that he told the teamster to wait and get the goods and bring them to the salvage room, and did not wait to see what they were; and this is substantially corroborated by the teamster. As to the Durand & Kaspar goods, he testified that he had told his partner, *Newton,* to order them in the middle of the week, and that he supposed they had arrived on Saturday, as such orders usually did. There was evidently much confusion and some excitement at this time as the result of the fire; the separation of the salvage, and the search for the inventory book, which was at first thought to have been burned, and it would be natural enough that there should not be much system in the management of affairs. The bills themselves were comparatively small in amount, and, while there is certainly evidence tending to show that their inclusion in the proofs was wilful, we are not prepared to say that the evidence necessarily calls for that conclusion in opposition to the findings of the trial court. Careless men doing business with unbusinesslike methods might easily make such blunders, and the trial court, with the witnesses before him, may well have reached the conclusion that honest blundering and carelessness was the true explanation of the entire difficulty. We cannot, therefore, reverse the judgment upon this ground.

The objections that an inventory was not taken once a year, and that the inventory was not kept in a safe, may be easily disposed of. It is conceded that if the evidence was

sufficient to establish the fact that the inventory produced was in fact the inventory taken February 10, 1902, the fact that it was not in the safe at the time of the fire becomes immaterial. We consider the evidence sufficient on this point, and hence this objection is fully met.

The original policies, of which the present policies were issued by way of renewal, were issued, two in November, 1900, and one in June, 1901. Inventories were taken in April, 1901, and in February, 1902, and from this latter date until the happening of the fire no inventory had been taken, thus leaving an interval of sixteen months. The requirement is that an inventory be taken once a year. It would be unreasonable to construe this as meaning that each inventory must be taken exactly twelve months after the preceding one, on pain of a forfeiture. Had an inventory been taken in July, and the fire occurred in August, we think it could not be reasonably claimed that the requirement that an inventory be taken once a year had been breached. We therefore conclude that there had been no breach at the time of the fire in June.

The final contention made is that the court erred in requiring each company to pay its *pro rata* share of the entire loss, when the policies of the *Theresa* and *De Forest* companies contained the following stipulation as a rider:

"Permission is hereby granted for other insurance to an amount including this policy aggregating not to exceed seventy-five (75) per cent. of the actual cash value of the property; provided, however, that if at the time of the fire the total insurance on the property shall exceed said seventy-five (75) per cent., this policy shall hereby become void in the proportion of such excess to such total insurance."

In reply to this contention it is argued that such a provision is in violation of sec. 1943a, Stats. 1898, which reads as follows:

"No fire insurance company doing business in this state shall issue any policy containing any provision limiting the

amount to be paid in case of loss below the actual cash value of the property, if within the amount of the insurance for which premium is paid . . ."

This provision is not as clear in its meaning as could be wished, but the evident intent is to guaranty that the insured shall, under the circumstances named, receive the full benefit of the amount of the insurance for which he pays. The words "cash value of the property" evidently refer to the property destroyed, not the property insured. Supplying the missing word, the provision simply means that if the total cash value of the property destroyed is less than the total insurance, as in this case it was, no provision attached to the policy shall be effective to reduce the amount to be paid by the insurance companies to a sum less than that cash value. Such was the case here, and consequently the so-called "three-quarters clause" has no effect.

*By the Court.*—Judgments affirmed.